**Robert Lee THOMPSON, Petitioner,**

**v.**

**Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

**Civil Case No. 06–148.**

United States District Court,
S.D. Texas,
Houston Division.

Nov. 29, 2007.

Patrick F. McCann, Attorney At Law, Houston, TX, for Petitioner.

Baxter Morgan, Akin & Almanza, Gena Blount Bunn, Texas Attorney General, Austin, TX, for Respondent.

## MEMORANDUM AND OPINION

LEE H. ROSENTHAL, District Judge.

Robert Lee Thompson is a Texas death row inmate. He was convicted of capital murder committed during a robbery and sentenced to death. Thompson has filed a federal petition for a writ of habeas corpus. (Docket Entry No. 7). The respondent, Nathaniel Quarterman, has moved for summary judgment. (Docket Entry No. 15). After carefully considering the pleadings, the state court record, and the applicable law, the court grants the respondent's summary judgment motion, denies Thompson's habeas petition, and declines to issue a Certificate of Appealability. Final judgment is entered by separate order.

The reasons for these rulings are set out in detail below.

## I. Background

On state habeas review, the Texas Court of Criminal Appeals described the crime for which Thompson received a death sentence;

The State's evidence at trial showed that [Thompson] and Sammy Butler acted together in planning [an] armed robbery at the 7–Evenings Food Store. [Thompson] told Butler that this would be their last robbery and it was going to be "a big one." [Thompson], armed with a .25 caliber semiautomatic weapon, went into the convenience store to exchange a beer he had purchased earlier. Butler, armed with a .38 caliber revolver, came into the store with him.

[Thompson] approached Mubarakali Meredia, who was tending the counter, pointed his pistol at Mr. Meredia, and told him to open the cash register and hand over all of the money. [Thompson] shot Mr. Meredia in the abdomen when he did not move quickly enough. He shot at Mr. Meredia's cousin, Mansor Bhai Rahim Mohammed, who also worked at the shop, when he began running toward the back of the store.[1]

---

1. At Butler's trial, the State offered evidence that Butler pulled out his .38 revolver, shot at Rahim, and threatened several other customers.

[Thompson] then shot Mr. Meredia three more times as he lay on the floor. He ordered Mr. Meredia to get up and get the money for him. Mr. Meredia did so. Then [Thompson] put his pistol to Mr. Meredia's neck and pulled the trigger. Nothing happened. He had run out of bullets. So [Thompson] hit Mr. Meredia on the head with the butt of his gun and struck him with the cash register drawer. Nonetheless, Mr. Meredia survived.

[Thompson] took the money and ran out of the store. Butler grabbed a stack of lottery tickets as he followed behind [Thompson]. [Thompson] jumped into the driver's seat of their car, while Butler got into the passenger's seat, rolled down his window, and fired two shots at Mr. Rahim who had run to the front door. One bullet hit Mr. Rahim in the chest, and he died.

*Ex parte Thompson,* 179 S.W.3d 549, 551 (Tex.Crim.App.2005) (footnotes in original).

The State of Texas indicted Thompson for capital murder committed during a robbery. Trans., p. 2.[2] The trial court appointed two attorneys, Steven Greenlee and Connie Williams, to represent Thompson. The jury instructions submitted Thompson's capital-murder charge under three theories: (1) Thompson intentionally killed the victim during a robbery; (2) the Texas law allowed Thompson's conviction because he "solicited, encouraged, directed, aided, or attempted to aid Sammy Butler in shooting" the victim; and (3) Thompson was liable under a conspiracy theory because he "entered into an agreement with Sammy Butler to commit the felony offense of robbery" and "while in the course of said conspiracy, Sammy Butler caused the death of the [victim] ... in furtherance of the conspiracy and was an offense that should have been anticipated by" Thompson. Trans., p. 137. On March 25, 1998, the jury found Thompson guilty of capital murder. Trans., p. 143. The verdict form did not specify under which theory the jury convicted Thompson.

After the presentation of testimony and other evidence in a separate penalty phase, the jury answered the special issues prescribed by Texas law, as follows:

*Special Issue No. 1*

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Robert Lee Thompson, would commit criminal acts of violence that would constitute a continuing threat to society?

*Special Issue No. 2*

Do you find from the evidence beyond a reasonable doubt that Robert Lee Thompson, the defendant himself, actually caused the death of Mansoor Bhai Rahim Mohammed, on the occasion in question, or if he did not actually cause the death of Mansoor Bhai Rahim Mohammed, that he intended to kill Mansoor Bhai Rahim Mohammed or another or that he anticipated that a human life would be taken?

*Special Issue No. 3*

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Robert Lee

---

2. The state-court records consist of a one-volume transcript that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Trans., p. ___"; a 28–volume Statement of Facts, including hearings on pretrial motions, jury voir dire examination, the guilt/innocence phase, and the penalty phase, cited as "S.F. Vol. ___, p. ___."; and a transcript of the state habeas proceedings, cited as "S.H., p. ___."

Thompson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Trans., pp. 154–56. The jury's answers to the special issues authorized the death penalty.

Thompson unsuccessfully appealed his conviction and sentence to the Texas Court of Criminal Appeals. *Thompson v. State*, No. 73,128, 2003 WL 21466925 (Tex.Crim. App. June 25, 2003) (unpublished), *cert. denied*, 540 U.S. 1091, 124 S.Ct. 960, 157 L.Ed.2d 797 (2003). Thompson also sought state habeas relief while his direct appeal was pending. The trial-level state habeas court entered findings of fact and conclusions of law recommending that relief be denied. S.H., pp. 1099–1116. After receiving additional briefing, the Court of Criminal Appeals adopted the lower court's findings and conclusions and issued a published opinion denying habeas relief *Ex parte Thompson*, 179 S.W.3d 549 (Tex. Crim.App.2005).

This court appointed counsel to represent Thompson in his federal habeas proceedings. Thompson's federal habeas petition raises the following fifteen claims:

1. The trial court should have sustained trial counsel's objection when a police officer opined that Thompson was truthful when making his police statement.

2. The trial court failed to investigate a witness's claim that an unidentified juror made a racially derogatory comment.

3. Trial counsel's closing argument discussed Thompson's extraneous offenses in a manner that prejudiced his defense.

4. Trial counsel's punishment-phase closing arguments misstated the jury's duty under the second special issue.

5. The trial court made comments during voir dire that improperly extended the Texas law of the parties to the punishment phase.

6. Trial counsel should have requested a lesser-included-offense instruction on felony murder or murder.

7. Trial counsel failed to object to good-character evidence about the victim.

8. Trial counsel provided ineffective assistance by consenting to the dismissal of a prospective juror.

9. Trial counsel was not present in the courtroom during the voir dire examination of one prospective juror.

10. Thompson's death sentence violates the Constitution because his codefendant Butler was convicted of a less severe crime.

11. Thompson is factually innocent of capital murder.

12. The prosecution suppressed a statement Butler made to the police.

13. Due process and equal protection requires reformation of Thompson's conviction and sentence because Butler was convicted of a lesser crime.

14. Trial counsel failed to prepare and present important mitigating evidence.

15. Trial counsel ignored available defensive strategies in the guilt/innocence phase.

The respondent has moved for summary judgment, (Docket Entry No. 15), arguing that federal procedural law bars judicial consideration of some claims and that all the claims lack merit. Thompson has filed motions seeking to augment the factual record. (Docket Entry Nos. 19, 21, 22). Thompson also asks this court to stay this federal proceeding to allow him to exhaust

one of the claims in state court. (Docket Entry Nos. 20, 28). The respondent opposes those motions.

## II. The Applicable Legal Standards

"The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983); *see also Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 265, 67 L.Ed. 543 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved."). Principles of comity and federalism govern federal habeas proceedings, honoring the "presumption of finality and legality [that] attaches to [a petitioner's] conviction and sentence." *Barefoot,* 103 S.Ct. at 3392. The limits on both the availability and nature of habeas review guide this court's consideration of Thompson's federal petition.

### A. The Availability of Federal Review

The exhaustion and procedural default doctrines restrict a federal court's consideration of habeas claims. The federal courts have long required the exhaustion of state-court remedies. *See Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 740–41, 29 L.Ed. 868 (1886). To avoid the " 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional viola-

tion in the first instance," *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999), an inmate must raise his habeas claims in the highest state court before seeking federal relief. *See* 28 U.S.C. 2254(b)(2); *Fisher v. Texas,* 169 F.3d 295, 302 (5th Cir.1999); *Burns v. Estelle,* 695 F.2d 847, 849 (5th Cir.1983). If the petitioner has not exhausted some or all of the claims asserted in federal court, that court may not grant the claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merit s, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The respondent argues that Thompson has not exhausted claim 14.

The procedural default doctrine also limits federal habeas review. As "[a] corollary to the habeas statute's exhaustion requirement, ... federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley,* 541 U.S. 386, 124 S.Ct. 1847, 1851–52, 158 L.Ed.2d 659 (2004); *see also Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991) (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). Under the procedural bar doctrine, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman,* 111 S.Ct. at 2555.[3] In

---

**3.** A petitioner's failure to exhaust his claims may also result in a federal procedural bar. *See Horsley v. Johnson,* 197 F.3d 134, 137 (5th Cir.1999). "A procedural default ... occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his

claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir.1997) (quoting *Coleman,* 111 S.Ct. at 2556 n. 1). An inmate who files a petition containing unexhausted claims usu-

such cases, comity and federalism preclude federal review. *See Lambrix v. Singletary,* 520 U.S. 518, 117 S.Ct. 1517, 1523, 137 L.Ed.2d 771 (1997); *Coleman,* 111 S.Ct. at 2555. The respondent argues that a procedural bar forecloses review of Thompson's first, fifth, and eleventh claims.

A state procedural default need not be an insurmountable barrier to federal review. The Supreme Court has noted that:

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman,* 111 S.Ct. at 2565. The fundamental miscarriage of justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]' " *Haley,* 124 S.Ct. at 1852 (quoting *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986)). If the respondent shows that a state procedural bar precludes federal review, the petitioner bears the burden of showing that he can overcome this procedural hurdle. *See McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

## B. The AEDPA

Once a state prisoner complies with the procedural requirements for federal habeas review, a deferential standard of review applies to the federal court's review of the petitioner's constitutional claims. *See Woodford v. Garceau,* 538 U.S. 202, 123 S.Ct. 1398, 1401, 155 L.Ed.2d 363 (2003). The AEDPA forbids federal habeas relief on issues "adjudicated on the merit s" in a state court unless the decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The AEDPA requires federal-court deference to state factfindings unless the petitioner presents clear and convincing evidence in rebuttal. *See* 28 U.S.C. § 2254(e)(1).

## III. The Motions for Factual Development

Thompson has filed three motions seeking to augment the factual basis for his habeas claims. Thompson asks this court to: hold an evidentiary hearing; allow expansion of the habeas record; and permit discovery. (Docket Entry Nos. 19, 21, and 22).[4] Each motion identifies three habeas claims that need further factual development: (1) the ineffective-assistance-of-counsel claim; (2) the *Brady* claim; and (3) the claim that a juror made a racially charged comment. The motions then provide "specific allegations" to support the

---

ally cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. Pro. art. 11.071 § 5) generally prohibits the filing of successive state habeas applications. The Fifth Circuit has held that article 11.071 § 5 is an adequate state procedural bar, finding that Texas courts strictly and regularly enforce its standards. *See Barrientes v. Johnson,* 221 F.3d 741, 759 (5th Cir.2000); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.1998). A petitioner may over-

come article 11.071 § 5's subsequent bar of federal review by making a sufficient showing of cause and prejudice. *See Jones v. Johnson,* 171 F.3d 270, 277 (5th Cir.1999).

4. Thompson has also filed two motions to abate this case to allow the exhaustion of state court remedies. (Docket Entry Nos. 20, 28). The court addresses those motions in the section of this Order addressing the related habeas claim.

need for discovery of those claims. The motions then give a general statement of what added material is sought. Each of these motions suffers from a lack of specificity.

Thompson's motion to expand the habeas record states that the record should include "[l]etters predating the filing of the petition in district court," "[d]ocuments," "[e]xhibits," "[a]nswers under oath," and "[w]ritten [i]nterrogatories propounded/approved by the judge (if so directed)." (Docket Entry No. 19 at 2). Although Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts allows such material, Thompson's motion makes no effort to show what omissions exist in the record, about specific material he wants to include, or why that material is necessary. Thompson refers to certain of his claims and then restates the kinds of material covered by Rule 7. He does not link his request to the facts of his case, the contents of the record, or the specific materials he wants to add to that record.

The current record is large. It already includes the transcripts from the state trial, appellate, and habeas proceedings, the exhibits, and the state-court pleadings, motions, and briefs. Thompson's motion for expansion of the record is, in essence, a general discovery request. He seeks depositions and interrogatories from all those associated with his trial, including the jurors. He also wants to discover unspecified material from the District Attorney's office files.

■ To warrant such discovery, Thompson "must demonstrate 'a specifically alleged factual dispute, not ... a general allegation.'" *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir.2000). "[C]onclusory allegations unsupported by specifics" will not entitle a petitioner to discovery or other factual development. *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52

L.Ed.2d 136 (1977). A court need not "authorize fishing expeditions." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). Thompson's requests to augment the factual background of this case lack the necessary specificity.

■ Thompson's motion for an evidentiary hearing does describe what testimony he would like to adduce. But the motion has other deficiencies. The AEDPA generally restricts federal evidentiary hearings if a petitioner "has failed to develop the factual basis of a claim in State court proceedings[.]" 28 U.S.C. § 2254(e)(2). To warrant an evidentiary hearing, "the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error." *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000). Thompson has not shown that he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 120 S.Ct. at 1479. Thompson has not shown that he has met the AEDPA's threshold diligence requirements, much less that an evidentiary hearing is necessary for a fair and thorough adjudication of his claims.

■ Thompson's motions for factual development lack specificity and fail to make the necessary showing that such development is permitted by federal law or necessary for the proper adjudication of the claims before the court. Thompson's motions for factual development are denied.

## IV. The Habeas Claims

### A. Trial Court Error (Claims 1, 2, and 5)

In these claims, Thompson alleges that the trial court committed errors that violated his constitutional rights. Thompson alleges that the trial court should have limited a police officer's testimony about

the truthfulness of Thompson's pretrial statements (Claim 1). Thompson also alleges that the trial court should have been more aggressive in investigating a statement allegedly made by a juror during trial (Claim 2). Finally, Thompson contends that the jury instructions misstated the law (Claim 5). The state courts denied each claim. Thompson does not show that the state-court adjudication was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 1. Testimony as to the Truthfulness of Thompson's "Philosophy" (Claim 1)

■ During the trial's punishment phase, the prosecution played audiotaped statements that Thompson made after his arrest. Milton F. Waters, a Houston Police Department officer who participated in taking Thompson's statements, described the circumstances surrounding those statements. As part of that testimony, Officer Waters stated that "Thompson wanted to make [a taped statement] for the purpose of making clear to those who might listen to it what his particular philosophy was behind the aggravated robberies and the capital murder." S.F. Vol. 25, p. 19. Thompson set out his "philosophy" in a rambling, racially charged statement. Thompson described his conduct as God's judgment against certain groups who operated businesses in his community. Thompson described himself as an agent for divine judgment. He stated, "I wasn't going out to just rob people for money and to hurt them," but as "just a point, how can you come in our neighborhoods and do us like that and think we not God's people ... in your heart you know you being punished .... [y]ou know you just been

judged[.]" *Thompson*, 2003 WL 21466925, at *1 n. 2.[5]

On cross-examination, defense counsel asked Officer Waters two questions: whether Thompson was cooperative and whether "he was lying or leaving out anything[.]" S.F. Vol. 25, p. 37. Officer Waters answered that Thompson had been both cooperative and honest. S.F. Vol. 25, p. 37. On redirect, the prosecution asked only one question:

> The State: Did you have a feeling, sir, that he was telling the truth about his philosophy?
>
> Trial Counsel: Objection. Calls for speculation.
>
> The State: He opened that door.
>
> Trial Court: Overruled.
>
> Officer Waters: Repeat the question, please.
>
> The State: Did you have a feeling, sir, that he was telling the truth about this philosophy of his?
>
> Officer Waters: Yes.

S.F. Vol. 25, p. 38.

Thompson's claim of error is limited to this last question and answer. Thompson argues that the trial court should have sustained the defense objection to the prosecutor's question on redirect because (1) the questions and answers were irrelevant and (2) Officer Waters "had no business stating an opinion on truthfulness one way or another." (Docket Entry No. 7 at 11). Without citing any case law, Thompson asserts that Officer Waters's answer to the question violated the Sixth Amendment right to a fair trial.

Thompson raised this claim on direct appeal. The Court of Criminal Appeals stated that Thompson's objection at trial

---

**5.** The record does not contain a complete transcription of Thompson's "philosophy," but does contain audiotaped recordings of Thompson's statements to the police. The

Court of Criminal Appeals provided a partial transcript of Thompson's statements in its opinion on direct appeal. *See Thompson*, 2003 WL 21466925, at *1 n. 2.

was not consistent with his appellate argument. *See Thompson,* 2003 WL 21466925, at \*1 ("Because his trial objection does not comport with the issue raised on appeal, he has preserved nothing for our review."). On direct appeal, Thompson had argued that Officer Waters impermissibly testified as an expert witness when he testified that Thompson believed his own "philosophy." Appellant's Brief at 24–28, *Thompson v. State,* No. 73,128, 2003 WL 21466925 (Tex. Crim.App. June 25, 2003). The Court of Criminal Appeals found that this appellate claim of error differed from the trial objection that Officer Waters's testimony was speculative. The Court of Criminal Appeals relied on a Texas rule that is part of the contemporaneous-objection rule and requires a defendant to raise the same objection at trial and on appeal. *See Knox v. State,* 934 S.W.2d 678, 687 (Tex.Crim. App.1996); *Barnes v. State,* 876 S.W.2d 316, 325 (Tex.Crim.App.1994). The Fifth Circuit has held that this contemporaneous-objection rule is "an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. State,* 169 F.3d 295, 300 (5th Cir.1999); *see also Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir.2003); *Sharp v. Johnson,* 107 F.3d 282, 285–86 (5th Cir. 1997); *Nichols v. Scott,* 69 F.3d 1255, 1280 n. 48 (5th Cir.1995). This court cannot consider the merit's of this claim unless Thompson overcomes the procedural bar. *See Coleman,* 111 S.Ct. at 2565.

In his response to the respondent's summary judgment motion, Thompson claims that the Court of Criminal Appeals was incorrect in finding that his trial objection differed from the appellate claim. Federal courts generally do not assess whether a state court improperly applied its own procedural law. *See Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law ques-

tions."); *Poland v. Stewart,* 169 F.3d 573, 584 (9th Cir.1999) ("Federal habeas courts lack jurisdiction ... to review state court applications of state procedural rules."); *Sweet v. Delo,* 125 F.3d 1144, 1151 (8th Cir.1997) ("If the highest [state] court ... concludes [an inmate's] claims have not been properly raised in a state habeas proceeding, that is the end of the matter"); *Schleeper v. Groose,* 36 F.3d 735, 737 (8th Cir.1994) (finding that "a state's misapplication of its own procedural rule is not cause for default" because "[a] federal court may not re-examine a state court's interpretation and application of state law"). If the State's procedure is adequate and independent from federal law, this court must then honor the State's application of its own procedural law. *See Barnes v. Thompson,* 58 F.3d 971, 974 n. 2 (4th Cir.1995) ("A basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground.").

Other than arguing that the Court of Criminal Appeals misapplied its own law, Thompson makes no effort to excuse his failure to advance this claim in a procedurally adequate manner. Federal law prevents consideration of Thompson's first claim.

■ Even if this court did reach the merit's of this first claim, Thompson has not shown that it entitles him to federal habeas relief. Thompson objects to the state trial court's admission of one answer to one question. "In habeas actions, this court does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir.1998); *see also Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir.1999). As the Fifth Circuit has noted:

'[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown. If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease. For in every trial, or at least nearly every trial, there will be, there are bound to be, some mistakes. What elevates the 'mistake' to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some State complicity in it.'

*Shaw v. Estelle*, 686 F.2d 273, 275 (5th Cir.1982) (quoting *Luna v. Beto*, 395 F.2d 35 (5th Cir.1968) (Brown, C. J., specially concurring)); *see also Brown v. Dretke*, 419 F.3d 365, 377 (5th Cir.2005); *Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001).

Thompson has not shown that admitting Officer Waters's answer to the prosecutor's question made the trial unfair. Asking Officer Waters on redirect whether Thompson appeared to believe his own "philosophy" naturally flowed from defense counsel's questions on cross-examination testimony about Thompson's truthfulness to the police. Even if the question and answer on redirect were improper, Officer Waters's statement that Thompson seemed sincere in attributing his actions to his philosophy was neither crucial, critical, nor significant to the trial outcome. There is no basis to infer that Officer Waters's opinion as to Thompson's belief in what he described as his philosophy had any impact on the jury's answers to the special issues. Even if this court could reach the merit's of Thompson's first claim, he has not shown an entitlement to federal habeas relief.

## 2. Failure to Investigate Possible Juror Bias (Claim 2)

During the trial's punishment phase, Thompson called Tom Collier as a witness. Collier was a lay preacher in the church Thompson belonged to. Both Thompson and Collier are African–American. Collier testified that Thompson "was very active in the church," was not known to engage in criminal activity, and was "worth sparing or saving." S.F. Vol. 27, pp. 41–45. The State's cross-examination contrasted Thompson's religious background with his criminal actions. S.F. Vol. 27, pp. 46–50. The State emphasized Thompson's complaint that "[t]he only image you get from a black person on the news is robbing, killing, and stuff like that," and his own statements justifying his crimes as divine judgment on other minority groups. S.F. Vol. 27, p. 49. Collier testified that his church never taught Thompson to judge, rob, or kill people. S.F. Vol. 27, p. 50.

As Collier left the stand, he allegedly heard a juror say, "poor little black boy." Collier told the defense. The trial court held a hearing outside the jury's presence to discuss the comment. Collier told the court that he heard a male juror make the statement and that, in his opinion, it was racist. S.F. Vol. 27, pp. 54–55. Collier admitted that he could not identify which juror made the remark, that he did not know what the juror meant by the comment, and that he did not know if any other jurors had heard it. S.F. Vol. 27, pp. 57–58.

Defense counsel asked the trial court to interview each male juror to find out who had made the statement and discover whether the juror held racist views. S.F. Vol. 27, p. 59. The trial court denied that request. S.F. Vol. 27, p. 59.

On direct appeal, Thompson argued that the trial court should have investigated the statement more thoroughly. The Court of

Criminal Appeals found that Thompson should have probed the jurors' racial views during jury selection, not during the middle of trial. *See Thompson*, 2003 WL 21466925, at *1 ("For obvious reasons, we have long held that voir dire examination is the time to uncover potential prejudice or bias in prospective jurors during voir dire, and that a defendant who begins the inquiry in the middle of the trial is not acting timely."). The Court of Criminal Appeals stated that, "[b]ecause defense counsel did not diligently question the jurors about racial bias during voir dire, an alleged bias manifested later does not constitute juror misconduct." *Id.* at *2. The Court of Criminal Appeals then emphasized that, "[p]erhaps more importantly," the record did not unambiguously show that the comment was racist:

> To begin with, it is not clear whether the statement referred to the witness or [Thompson]. If it did refer to [Thompson], it is not clear whether it was sincere or ironic. If it was ironic, it is not clear that racial animosity was its gravamen. It seems at least possible that it could have been a skeptical summary of the witness's depiction of [Thompson], which was markedly different from the other evidence that the jury had heard about his character. That is, the remark could have been the juror's opinion that the witness wanted the jury to see [Thompson] as just a poor, little, black boy.

*Id.* The Court of Criminal Appeals concluded that the trial court's treatment of the issue did not infringe Thompson's Fifth or Fourteenth Amendment rights.

In this petition, Thompson again argues that the trial court should have inquired further. Thompson asserts that "[i]f racism had any part in the decision by even one juror to assess death, this verdict is void. To refuse to even look into that possibility when it was fairly raised is nether a reasonable interpretation of exist-

ing Supreme Court precedent nor a reasonable view of the facts on the ground." (Docket Entry No. 26 at 10).

■■■ The Constitution guarantees a criminal defendant a trial by an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992). Thompson's claim raises two issues: (1) the sufficiency of the trial court's response to the alleged comment; and (2) the possibility that racism tainted Thompson's trial. While "[t]here is no Fifth Circuit precedent that prescribes a procedure for investigating and resolving allegations of jury racial bias made during the trial," *United States v. Sotelo*, 97 F.3d 782, 796 (5th Cir.1996), the case law makes the guiding principles clear. "A jury is initially cloaked with a presumption of impartiality." *Dorsey v. Quarterman*, 494 F.3d 527, 531 (5th Cir.2007). When significant allegations of possible juror bias are made, a trial court must hold "a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *see also Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982) ("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). But the Constitution does not require an extensive inquiry into every allegation of juror bias. *See Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991) (stressing the "wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and other areas of inquiry that might tend to show juror bias"); *Williams v. Bagley*, 380 F.3d 932, 949 (6th Cir.2004) ("The Sixth Amendment does not obligate state trial courts to investigate every allegation of bias or juror misconduct."); *United States v. Posada–Rios*, 158 F.3d 832, 877 (5th Cir.1998) (recognizing a judge's "wide discretion" in considering accusations of bias). If an allegation of bias

arises, a court must "assess the severity of the suspected intrusion" and, if necessary, allow further inquiry. *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir.1998). The ultimate question is whether the jury was impartial.

The trial court did not ignore the accusation of a juror's bias. When presented with an allegation that a juror had made a racially charged comment, the trial court held a hearing. The witness described the comment he had heard and his interpretation of that comment. The witness acknowledged the limits of the information he had. The trial court did not investigate further after it became clear that Collier could not identify who made the statement or give any other specifics.

■ As the state courts stated when Thompson raised this claim, Texas law does not favor midtrial investigation into possible juror bias. Texas procedure requires a party to probe a juror's potential biases during jury selection. *See Gonzales v. State*, 3 S.W.3d 915, 916–17 (Tex.Crim. App.1999); *cf.* *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir.1980) ("The prejudice complained of is alleged to be the product of personal experiences unrelated to this litigation. The proper time to discover such prejudices is when the jury is being selected and peremptory challenges are available to the attorneys."). If a defendant later "wishe[s] to show bias on the part of a juror, [the] proper remedy [is] a motion for new trial with an accompanying affidavit by a juror showing such

bias." *Norman v. State*, 588 S.W.2d 340, 347 (Tex.Crim.App.1979). Thompson's voir dire examination of the prospective jurors did not explore the potential for racial bias. Nor did Thompson use other state-court opportunities to raise this issue. Thompson did not file a motion for a new trial based on the alleged racist comment by one juror. Thompson made no posttrial effort to develop the factual basis for this claim.

Thompson did not make any attempt in his state direct appeal or on habeas review to obtain affidavits or other testimony from Collier, the trial participants, or the jurors. Thompson's assertion that a juror was biased and unable to be impartial lacks factual support. Based on the record, the Court of Criminal Appeals reasonably found that Thompson did not show jury bias.

In this forum, Thompson again has not provided any basis for his allegation that racial bias tainted the jury. Only speculation supports Thompson's claim that additional inquiry by the trial court would have revealed that a juror harbored racial prejudice that harmed the defense.[6] The trial court made an implicit finding that no jury bias threatened the fairness of Thompson's trial. The trial court's intimate familiarity with the trial, including Collier's demeanor and credibility and the jury, placed it in a far better position than this court to decide whether further inquiry into the potential for juror bias was required. *See United States v. Ramos*, 71 F.3d 1150, 1153–54

---

**6.** Thompson asks this court to hold an evidentiary hearing and allow discovery that would allow questioning of each male juror to find out who made the comment and why. To warrant discovery, the taking of affidavits, or an evidentiary hearing on this issue, Thompson must show that he diligently sought factual development in state court. *See* 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1488, 146 L.Ed.2d 435 (2000) (prohibiting an evidentiary hearing if

"there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"); *Isaacs v. Head*, 300 F.3d 1232, 1248 (11th Cir.2002) (linking the standards for discovery to 28 U.S.C. § 2254(e)(2)'s diligence requirement). Thompson did not give the state courts an opportunity to address the alleged racism in the first instance. He has not shown that he is entitled to attempt to do so here.

(5th Cir.1995) ("[T]he trial judge is in the best position to evaluate accurately the complained-of outside influence.").

The state trial court was required to safeguard Thompson's right to a trial by impartial jurors. *See Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir.2006). The trial court inquired into the allegedly racist comment and found no basis for additional inquiry. Thompson has not shown that additional inquiry would have uncovered evidence of bias by one juror or that the comment influenced the jury deliberations. *Cf. Ransom v. Cockrell*, 62 Fed.Appx. 557 (5th Cir.2003) (denying relief when a juror allegedly made a racist comment during a break in the trial proceedings). Instead, his claim relies on speculation that the comment referred to him, that the comment revealed racial animus, and that racism affected the jury's verdict. The decision of the Court of Criminal Appeals on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Thompson has not met his burden under the AEDPA on this claim.

### 3. Application of the Texas Law of the Parties at the Penalty Phase (Claim 5)

Thompson argues that the trial court made statements during jury selection that lowered the prosecution's burden in the punishment phase. Thompson states that the trial court lowered the jury's duty in answering the second special issue, but does not identify which trial-court statements had this effect. On state appellate review, Thompson argued that the trial court made statements that allowed the jury to convict if Thompson *should have* anticipated that his actions would take a human life. S.F. Vol. 9, pp. 218–19, 227, 228–29.

The trial court made the following statements to the jury panel:

The question is: "Do you find from the evidence beyond a reasonable doubt"— and remember that when you have that language that means the State has to prove to you beyond a reasonable doubt—so they have the burden—"that the defendant," either one, "actually caused the death of the deceased"—so, either killed him himself—or, Number 2, they actually—let's see—"did not actually cause the death of the deceased but intended to kill the deceased or another"-and basically the law says under the circumstances of the case and *should have* "anticipated that a human life would be taken."

S.F. Vol. 9, p. 212 (emphasis added).

Thompson claimed that these statements diluted the jury's punishment-phase duty to find that he "actually caused the death ... intended to kill ... or that he anticipated that a human life would be taken[.]". When Thompson raised this issue on direct review, the Court of Criminal Appeals refused to consider the merit's because Thompson had "failed to object to the trial court's voir dire of the jury, therefore failing to preserve this error for review." *Thompson*, 2003 WL 21466925, at *7. Thompson makes no effort to overcome the federal procedural bar resulting from the operation of the Texas contemporaneous-objection rule. This court cannot reach the merit's of this claim.

Even if this court could consider the merits of Thompson's fifth claim, the record does not permit an inference that the trial court's use of the phrase "should have anticipated" during jury selection had any impact on the jury's deliberations. "The comments of the court ... during voir dire were surely a distant and convoluted memory by the time the jurors began their deliberations on [Thompson's] sentence." *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 1923, 150 L.Ed.2d 9

(2001). Before retiring to deliberate, the trial court and the parties instructed the jury to answer the special issues. The qualifiers the trial court used earlier were not included.[7] The trial court's punishment-phase instructions accurately tracked statutory law. The law presumes that jurors will follow their instructions. *See Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). Thompson has not shown that the trial court's comment in the voir dire examination improperly skewed the jury's consideration of the special issues.

### B. Ineffective Assistance of Trial Counsel (Claims 3, 4, 6–9, 14, and 15)

Thompson raises several grounds for arguing that his trial attorneys provided ineffective assistance. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003); *see also Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 104 S.Ct. at 2071.

To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id.* at 2064. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 2065. Ineffective assistance claims focus on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.*[8] "[J]udicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 2066.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 104 S.Ct. at 2068; *see also Wiggins,* 123 S.Ct. at 2542. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland,* 104 S.Ct. at 2068; *Wiggins,* 123 S.Ct. at 2542. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 104 S.Ct. at 2069.

Thompson raises several complaints about trial counsel's representation.[9] Each is discussed below.

---

7. Thompson raises a separate claim that his trial counsel improperly defined the second special issue during closing arguments. That claim is analyzed with Thompson's other ineffective-assistance-of-counsel claims.

8. The Fifth Circuit has cautioned that

 [a] claim of ineffective assistance of counsel must be judged with eyes directly upon the reality of the situation facing defense counsel at the time of the acts and not years later. This discipline best assures faithful

application of the objective measure of whether the decisions of defense counsel are within the range of those a reasonably competent lawyer might have made under those same facts and circumstances. It also takes us far along in judging its prejudice, if that inquiry is required.

*Black v. Cockrell,* 314 F.3d 752, 754–55 (5th Cir.2002).

9. Thompson's briefing makes many accusations against his trial attorneys that, while possibly providing context to his ineffective-

### 1. Counsel's Approach to Extraneous Offenses (Claim 3)

█ The prosecution presented a strong penalty phase case against Thompson. Penalty phase testimony showed that the victim's murder was the last event in a week-long robbery/murder spree. In that one week, Thompson had killed two other men while robbing convenience stores. Thompson confessed to those murders as well as to several aggravated robberies. The jury instructions required the jury to consider prior offenses "only if the extraneous crime or bad act has been shown by the State beyond a reasonable doubt to have been committed by the defendant." Trans., p. 149. If the jury held "a reasonable doubt that [Thompson] committed an extraneous crime or bad act," then the jury could "not consider such evidence in answering the special issues." Trans., p. 150. The evidence as to the extraneous offenses presumably influenced the jury's consideration of whether Thompson would be a future danger to society.

Thompson challenges his attorneys' defensive strategy against the extraneous offenses. Defense counsel did not dispute that Thompson committed those offenses but instead characterized them as an aberration in an otherwise law-abiding life.[10] Thompson faults his attorneys for conceding the extraneous offenses without holding the prosecution to a proof-beyond-a-reasonable-doubt standard. Specifically, Thompson points to trial counsel's closing argument in the punishment phase:

---

assistance claims, do not present actionable grounds for relief. For instance, Thompson discusses at length the fact that the Texas State Bar had previously suspended his lead trial attorney's license for failing to attend to his clients. The state habeas court found that because counsel

> was not subject to disciplinary action in his practice of law during his representation of [Thompson] and because none of the disciplinary actions against [counsel] stemmed from his representation of [Thompson] in the instant capital murder, [trial counsel's] disciplinary history is not relevant to the issue of whether [Thompson] was afforded the effective assistance of counsel during the instant capital murder trial.

S.H., p. 1113. While trial counsel's disciplinary history provides background that must be considered, the *Strickland* inquiry does not focus on the reputation, character, or litigation history of attorneys. *See Hughes v. Dretke*, 412 F.3d 582, 590 (5th Cir.2005) (refusing to establish a *per se* rule of ineffective assistance because of trial counsel's inadequate experience); *United States v. Maria–Martinez*, 143 F.3d 914, 916 (5th Cir.1998) ("This court has never applied a *per se* ineffectiveness rule; accordingly, whether and when we may apply such a rule is *res nova* in this circuit."). Apart from cases involving the complete or constructive denial of counsel, "there is generally no basis for finding a Sixth Amendment

violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657(1984). *Strickland* stresses counsel's representation in the particular case. The issue is how Thompson's trial counsel performed in his trial, not in other cases.

**10.** Only one of Thompson's trial attorneys, Greenlee, provided an affidavit in state habeas court. Greenlee's habeas affidavit affirms that "[t]he main problems, for us, on [the future-dangerous issue] were Mr. Thompson's confessions, in which he stated if that if allowed to return to the streets he would kill again ... [a]nd ... the evidence of the extraneous 2 capital[] [murders]." S.H., p. 877. Trial counsel's strategy in countering this strong evidence was to show that "Thompson's behavior was an aberration, and that prior to this 24 hour time period had never been in any trouble." S.H., p. 877. The record does not contain an affidavit from co-counsel Williams. While Thompson's state habeas attorney signed an affidavit purporting to convey comments Williams had made to the habeas attorney's investigator, S.H., p. 60–62, Thompson has made no effort to substantiate the double hearsay comments in that document.

And in the state of Texas—which may well be different than other states— you're allowed to hear evidence of unadjudicated extraneous offenses and, so, the State brought you seven of those, two of which were capital murders.

*Now, your role in that particular process, in terms of viewing the extraneouses, is not to find Mr. Thompson guilty of extraneous offenses.* That may or may not be for another jury to decide. *Your duty and responsibility—the information given to you to help you, if it does, in trying to answer the notion of whether or not this young man would be a threat in the future.*

S.F. Vol. 27, pp. 80–81 (emphasis added).

On direct appeal, Thompson faulted his trial counsel for lessening the State's burden of proving the extraneous offenses. The Court of Criminal Appeals found that trial counsel did not necessarily "alleviate[ ] the State's burden of proof on extraneous offenses," but instead "explained to the jury that its role was not to render a verdict on the extraneous offenses but to consider them in assessing the special issues—a true statement." *Thompson,* 2003 WL 21466925, at *7. Relying on the jury instructions, which correctly explained the State's burden, the Court of Criminal Appeals found it "unlikely that the argument would have [the effect of lowering the prosecution's burden] since it was not contrary to the court's charge[.]" *Thompson,* 2003 WL 21466925, at *7.

In this federal proceeding, Thompson again argues that his trial counsel "urged [the jury] to weigh [the extraneous] offenses on the issue of future dangerousness without first screening them as they are required to do by the court's jury instruction." (Docket Entry No. 7 at 14). Thompson equates trial counsel's statement that the jury was not to find him "guilty of extraneous offense[s]" with an authorization to ignore the jury instruc-

tions. S.F. Vol. 27, pp. 80–81. This argument misapprehends the jury's duty in considering extraneous offenses in the penalty phase. A guilty verdict requires the prosecution to prove all the elements of an offense beyond a reasonable doubt and takes into consideration defenses and justifications. *See Huizar v. State,* 12 S.W.3d 479, 482 (Tex.Crim.App.2000). Texas law "does not require that the State prove all elements of an extraneous offense beyond a reasonable doubt." *Parr v. State,* — S.W.3d ——, 2006 WL 1544742, at *4 (Tex.Crim.App. June 7, 2006); *see also Adanandus v. State,* 866 S.W.2d 210, 233 (Tex.Crim.App.1993). A jury considering extraneous offenses determines whether the defendant committed the offenses and they are relevant to the special issues. Trial counsel properly focused the jury's attention on the commission of, rather than conviction for, the extraneous offenses.

Trial counsel faced a daunting task in the penalty phase. Thompson had confessed to several extraneous offenses, including two capital murders. Ample evidence showed that Thompson committed the extraneous offenses he had confessed to committing them. Trial counsel sought to blunt the impact of the extraneous offenses by painting them as an aberration in an otherwise nonviolent life. The Supreme Court has held that strategic concessions in a capital trial's penalty phase are not *per se* ineffective assistance. *See Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 563, 160 L.Ed.2d 565 (2004). As the Supreme Court has observed:

counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage .... Judicial review of a defense attorney's summation is therefore highly def-

erential—and doubly deferential when it is conducted through the lens of federal habeas. *Gentry,* 124 S.Ct. at 4; *see also Coble v. Quarterman,* 496 F.3d 430, 436 (5th Cir. 2007) (finding that a challenge to trial counsel's strategic closing argument did not establish ineffective assistance).

Thompson provides no basis to challenge the validity of his confession or to question his involvement in the extraneous offenses. Without a viable means of showing reasonable doubt with respect to those crimes, "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." *Nixon,* 125 S.Ct. at 562. To that end, trial counsel asked the jury to consider "the time frame that they took place[.]" S.F. Vol. 27, p. 84. Trial counsel forcefully argued that "for approximately one week" Thompson "engaged in outrageous behavior," but that otherwise "[t]here wasn't really any evidence of any criminal behavior as an adult." S.F. Vol. 27, p. 86. Trial counsel labeled that crime spree "an aberration ... just a snapshot. If we look at his life at the beginning of it, through his adolescent years, though his teenage years which would suggest that this behavior that occurred in that one week, approximately, would be behavior that would be repeated in the future." S.F. Vol. 27, pp. 88–89. Trial counsel's arguments served to place the extraneous offenses in a context that would allow the jury to find that Thompson did not deserve death.

Thompson has not shown that trial court's efforts fell below constitutional standards. Habeas relief is not available for this claim. *See* 28 U.S.C. § 2254(d)(1).

## 2. Counsel's Explanation of Party Liability (Claim 4)

■ Thompson argues that his trial counsel's closing argument lessened the State's burden of proving the second special issue. In the guilt/innocence phase, the jury instructions allowed for Thompson's conviction as a party to the offense if he "solicited, encouraged, direct, aided, or attempted to aid" Butler in the murder of Rahim. Trans., p. 137. The second special issue in the punishment phase, however, required the jury to find that Thompson "actually caused the death ... intended to kill Mansoor Bhai Rahim Mohammed or another or that he anticipated that a human life would be taken[.]" Trans., p. 155. The punishment phase issue required a more directed inquiry into Thompson's intent.

After Thompson's lead attorney made his closing argument, the second-chair counsel, Williams, made the following statement:

> [T]he punishment issues are not about public feeling. It's not about public opinion. It's not about sympathy, passion, prejudice, public opinion.
>
> Its about: Did the evidence convince you beyond a reasonable doubt that this person is going to be a threat to society in the future, *that he's responsible for this killing in some kind of way,* and that there's no sufficient mitigating circumstance that would cause you to vote in such a way where he would receive life imprisonment?

S.F. Vol. 27, pp. 101–02. Thompson contends that, by paraphrasing the second special issue as authorizing a capital sentence for a defendant who anticipated a killing "in some kind of way," trial counsel lessened the prosecution's burden.

Thompson raised this issue on direct appeal. The Court of Criminal Appeals assumed in its opinion that the defense had followed a strategy of deemphasizing the second special issue. The Court of Criminal Appeals did not directly address the question of whether trial counsel's

statement about the second special issue lowered the prosecution's burden.[11]

Thompson has not shown entitlement to federal habeas relief. Even assuming that Williams's paraphrase of the second special issue in argument suggested an improper legal standard, the entire context of the closing arguments held the prosecution to the proper burden of proof. Thompson emphasizes a small part of Williams's argument paraphrasing the second special issue. Greenlee's closing arguments extensively discussed Thompson's intent. Greenlee affirmed that "Thompson did not shoot and kill" the victim, but that "it's very clear ... from the evidence that Sammy Butler did." S.F. Vol. 27, at 90. Greenlee emphasized that, when the shooting happened, Thompson had already "left the scene, had left from the inside of the store. Mr. Thompson, we know, was driving the car.... His intent, I think is very clear there. His intent is to leave the scene. He has done what he intended to do, which was to rob that store.... He had driven away." S.F., Vol. 27, pp. 91–92.

Greenlee argued that Thompson's "concern at that time [was] to get out of there—'I've done what I'm going to do, which is commit this robbery; and now it's time for me to get out of here.'" S.F. Vol. 27, p. 97. Because nothing suggested that Thompson wanted Butler to shoot the victim, Greenlee argued that the prosecution had not met its burden of showing intent beyond a reasonable doubt. S.F. Vol. 27, pp. 93–98. On that basis, Greenlee argued that the jury should answer the second special issue in Thompson's favor.

The jury instructions properly tracked Texas law, requiring the State to prove Thompson's intent to kill "beyond a reasonable doubt." Trans., p. 146. The evidence showed that Thompson and Butler both came to the convenience store armed with guns. Thompson repeatedly shot Meredia, who survived. Thompson also shot at Rahim, but missed. Butler fired the shot at Rahim that killed him. Thompson had killed two men in similar robberies earlier that week. It is not probable that the brief paraphrase by

---

11. The Court of Criminal Appeals opinion stated:

> Our view of the record is that counsel adhered to a strategy first manifested during voir dire, when he concentrated his questioning regarding the special issues almost exclusively on future dangerousness and mitigation. Likewise, during closing arguments on punishment, counsel Williams merely paraphrased the second special issue following counsel Greenlee's fuller explication.
>
> Absent evidence to the contrary, we must presume that counsel strategically decided to avert attention from the second special issue throughout trial, first during voir dire, and later in punishment phase closing arguments. It would be a reasonable strategic decision that the other special issues were more likely to swing in the [Thompson's] favor, and that counsel should avoid repetition of an issue that, in light of the jury's guilty verdict, was weak. Because we conclude that counsel's actions conformed with

> trial strategy, we overrule [this] point of error[.]

*Thompson*, 2003 WL 21466925, *7 (citation and footnote omitted). Thompson raised this issue on state habeas review. The record does not contain an affidavit from Williams explaining his choice of words. Greenlee stated in his affidavit that his strategy was to emphasize that (1) Thompson was not the shooter, (2) he only intended to commit an aggravated robbery, and (3) he did not anticipate that Butler would kill anyone. This strategy did not ignore the second special issue. Trial counsel, however, recognized the weakness of this strategy because "the evidence showed that Mr. Thompson had shot at someone in the store during the robbery," encouraging the jury to find "that he was responsible both for the actions of Mr. Butler and the death of Mr. Rahim." S.H., p. 877. The state habeas court refused to consider the merits of this claim because the Court of Criminal Appeals had already adjudicated it on direct appeal. S.H., p. 1114.

counsel would not only authorize the jury to apply a standard of proof contrary to that stated in the jury instructions, but also to answer the special issues differently. Thompson fails to meet the *Strickland* standard with respect to this claim.

### 3. Counsel's Approach to a Lesser-Included Offense Instruction (Claims 6 and 15)

Thompson faults his trial counsel for not seeking a lesser-included offense instruction of murder or felony murder. Thompson emphasizes that in a separate trial, a different jury convicted Butler of felony murder, not capital murder.

The prosecution against Thompson rested on three theories. The jury could convict Thompson for intentionally shooting the victim during a robbery. The evidence did not show that Thompson fired the fatal shot and the prosecution's closing argument did not rest on that theory.[12] The second and third theories held Thompson liable for Butler's conduct. The jury instructions allowed for conviction under the Texas law of the parties if Thompson "solicited, encouraged, directed, aided, or attempted to aid Sammy Butler in shooting [the victim] . . . with the intention of killing him," or if Thompson engaged in a conspiracy with Butler and the murder was a foreseeable result.

The defense called no witnesses in the guilt/innocence phase. The defense requested, and received, a lesser-included offense instruction on aggravated robbery.

Trans., pp. 138–39. Consistent with this request, defense counsel made the strategic concession in closing argument that Thompson and Butler had agreed to commit a robbery. S.F. Vol. 24, pp. 130–32, 135. This concession allowed the defense to challenge the last two prosecutorial theories by portraying Butler's actions as exceeding what Thompson expected to happen in the robbery. Trial counsel argued that killing Rahim was a "random act" and that there was "reasonable doubt here that [Thompson] would not have in any way anticipated what Sammy Butler was going to do. Their whole goal was to go into the store . . . commit the robbery, and leave." S.F. Vol. 24 at 138–39. Trial counsel asked the jury to find that "[w]hat Sammy Butler did was . . . on the spur of the moment" and Thompson did not have any intent to kill because "[h]e's ready to get out of there. He's done what he agreed to do, which was to commit an aggravated robbery." S.F. Vol. 24 at 140–41. While defense counsel focused on showing that Thompson never "anticipated" the murder, the argument also challenged the State's reliance on the law of the parties. Defense counsel urged the jury to find Thompson guilty only of aggravated robbery. S.F. Vol. 24 at 143.

Thompson's federal petition explicitly asserts that trial counsel should have requested a lesser-included offense instruction of murder. Throughout his posttrial proceedings, Thompson has variously asserted that trial counsel should have requested a felony murder *or* murder instruction.[13] Because Thompson's federal

---

12. Thompson's claims rest on the premise that the jury convicted him as a party to the murder. The verdict form did not specify under which theory the jury found Thompson guilty of capital murder. Trans., p. 143. Thompson's arguments assume that the jury did not consider him the primary actor in the victim's murder. While the evidence more strongly supported the other theories of liability, and it is not probable that the jury found Thompson to be the shooter, this court cannot

completely dismiss the possibility that the jury found Thompson guilty of entering into a conspiracy to kill Rahim.

13. Thompson raised this claim twice in state court, both on direct appeal and on state habeas review. On direct appeal, Thompson faulted trial counsel for not seeking an instruction on *murder*. After reviewing the facts, the Court of Criminal Appeals refused to adjudicate the claim because nothing in the

briefing more closely resembles the showing required for a felony murder instruction, this court will address both lesser-included offenses.

■ Because Thompson brings this as an ineffective assistance of counsel claim, he must show that a lesser-included offense instruction was legally and factually available and that trial counsel's failure to request that instruction violated his constitutional rights. Two factors entitle a Texas defendant to a lesser-included offense instruction. First, "the proof for the offense charged includes the proof necessary to establish the lesser-included offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim.App.2007) (quotation omitted). Second, there must be "some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty *only* of the lesser-included offense." *Id.* (quotation omitted and emphasis add-

ed); *see also Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir.2005) ("A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime.") (relying on *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980)).

"In deciding whether a jury could rationally acquit on the capital crime and convict for the noncapital crime, [this court] must turn to Texas law." *East v. Scott*, 55 F.3d 996, 1005 (5th Cir.1995). Both felony murder and simple murder require a lower mental state than capital murder. Texas law imposes the following requirements for the crimes of capital murder, murder, and felony murder:

- *Capital Murder*—Capital murder, as it relates to this case, requires that the actor intentionally kill while committing or attempting to commit rob-

record established why trial counsel did not request a different instruction. *See Mallett v. State*, 65 S.W.3d 59, 63 (Tex.Crim.App.2001) ("In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions."); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex.Crim.App.1997) ("In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim."). When the Court of Criminal Appeals refused to consider Thompson's claim on direct appeal, he had already filed his state habeas application. Respondent had also entered a copy of trial counsel's affidavit into the state habeas record. The Court of Criminal Appeals knew that it would have another opportunity to pass upon the merit's of Thompson's ineffective assistance of counsel claim. Thompson's state habeas claim adopted the claim he raised on direct appeal, but also asserted that trial counsel should have requested a *felony* murder instruction. S.H., p. 43. The State's habeas response only focused on the *felony* murder instruction. The trial court's findings of fact and conclusions of law, issued two years after the opinion on direct appeal, relied heavily on trial counsel's affidavit and only addressed *felony*

murder. The Court of Criminal Appeals ordered additional briefing and oral arguments on two issues, one of which was Thompson's ineffectiveness claim relating to the lesser-included offense instructions. The Court of Criminal Appeals, however, specified that it wanted briefing on "failure to request a charge on *felony* murder." *Ex parte Thompson*, No. WR–61,379–01, (Tex.Crim.App. Apr. 13, 2005) (emphasis added). Thompson's briefing addressed both felony murder and murder instructions. The Court of Criminal Appeals' decision focused on *felony* murder. While Thompson's federal claim explicitly states that trial counsel should have sought a *murder* instruction, (Docket Entry No. 7 at 17), his briefing emphasizes the showing required for a *felony* murder instruction. He argues that trial counsel should have requested the same instruction as in Butler's case, which was felony murder. The respondent's summary judgment motion relies on the Court of Criminal Appeals' opinion on habeas review, which only focuses on a *felony* murder instruction. To be thorough, this court considers whether trial counsel should have requested a jury instruction on either lesser offense.

bery. *See* TEX. PENAL CODE § 19.03(a)(2) ("[T]he person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery . . ."). The Texas Penal Code defines "intentionally" as a "conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE § 6.03.

● *Simple Murder*—Murder differs from capital murder in two ways. First, murder does not require a predicate aggravating circumstance, like the contemporaneous commission of a felony. Second, murder requires *either* an intentional or knowing mental state. *See* TEX. PENAL CODE § 19.02(b)(1). Conduct is knowing if it is "reasonably certain to cause the result." TEX. PENAL CODE § 6.03.

● *Felony Murder*—Felony murder occurs when a defendant "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3); *see also Fuentes v. State*, 991 S.W.2d 267, 272 (Tex.Crim.App.1999) ("Felony

murder is an unintentional murder committed in the course of committing a felony"). Felony murder differs from the other two crimes because of its lower mental state, which must not rise to intentional or knowing conduct. *See Medina v. State*, 7 S.W.3d 633, 639 (Tex.Crim.App.1999).

Thompson's claim that counsel should have sought an instruction on murder as a lesser-included offense does not provide a viable ground for relief. Seeking a murder instruction benefits the defense if: (1) the evidence does not show the commission of the underlying felony required by capital murder or (2) the actor's intent did not rise to the "intentional" requirement of capital murder, but still satisfies the "knowing" requirement. Thompson does not, and cannot, argue that the evidence would not support the underlying felony of robbery required by capital murder. To show entitlement to a lesser-included instruction of murder, Thompson must show that his intent was "knowing" rather than "intentional." Thompson does not try to make this showing. Thompson instead argues that the jury should have found that he did not intend to kill Rahim at all. The evidence does not support this argument.[14] Trial counsel was not ineffective for failing to seek a lesser-included offense instruction of murder.

14. In state court, Thompson argued that "[t]he jury could have believed, based upon [his] statement, that Sammy Butler knowingly, but not intentionally, killed the victim." Appellant's Brief at 74, *Thompson v. State*, No. 73,128, 2003 WL 21466925 (Tex.Crim. App. June 25, 2003). Thompson incorrectly argued that the jury should consider Butler's, not his own, intent. The jury instead had to focus on Thompson's intent. *See Salinas v. State*, 163 S.W.3d 734, 742 (Tex.Crim.App. 2005) (focusing on a defendant's intent, not that of other parties or conspirators); *Santana v. State*, 714 S.W.2d 1, 9 (Tex.Crim.App. 1986) (same). On state habeas review, one

judge wrote a concurring opinion that debated whether the Texas law of the parties and the conspiracy theories focused on the defendant's or the principal actor's intent. *Ex parte Thompson*, 179 S.W.3d at 562–65 (Keller, J., concurring). The concurrence, however, found that, even focusing on Butler's intent, significant trial evidence showed that he intended to kill Rahim. This court defers to the majority's interpretation of Texas law in focusing on Thompson's intent. *See Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 2499, 115 L.Ed.2d 555 (1991) (refusing to second-guess a state's interpretation of its criminal statutes).

A felony murder instruction argument fares no better. Under Texas law, a felony murder charge requires "some evidence that would permit a jury rationally to find the defendant had the intent to commit robbery but not to cause the death of the victim." *Threadgill v. State,* 146 S.W.3d 654, 665 (Tex.Crim.App.2004). The Court of Criminal Appeals found that a lesser-included offense instruction on felony murder would not be appropriate because Thompson failed to offer any proof that he lacked the intent to kill. Thompson tried to minimize his own intent by relying on Butler's statements in his confession that he "just shot basically at the window just to make the man go run back in the store as we got away." Thompson wholly failed to prove that his own intent was not to kill. The Court Criminal Appeals found that because "[t]he evidence was clearly sufficient to establish that [Thompson] participated in the murder of [the victim] ... [he] was not entitled to a charge on felony-murder and therefore his counsel was not ineffective for failing to request such a charge." *Ex parte Thompson,* 179 S.W.3d at 559.

■ Trial counsel made a reasoned—and reasonable—strategic decision not to rely on a felony-murder instruction. Trial counsel viewed the evidence against his client realistically: "The actions of Mr. Butler in shooting [the victim] were, in my opinion[,] consistent with their intent as Mr. Thompson shot on[e] of the customers in the store." S.H., p. 877.

On state habeas review, the Court of Criminal Appeals found that trial counsel made "the reasoned strategic decision that their strongest argument was that [Thompson] did not and could not have anticipated that Butler would shoot Mr. Rahim as the two departed from the convenience store." *Ex parte Thompson,* 179 S.W.3d at 558. Trial counsel arrived at this strategy after reviewing the facts and

Butler's statement. From interviewing Butler, trial counsel ascertained that the jury would view Thompson's intent in the context of two factors: (1) "they both planned the robbery and brought guns" and (2) "the actions of Mr. Butler in shooting [the victim] were, in my opinion[,] consistent with their intent as Mr. Thompson shot on[e] of the customers in the store" S.H., p. 877. "[B]ased on the confessions, and the actions of Mr. Thompson while inside the store, i.e., Mr. Thompson shot someone who did not die[,]" trial counsel "concluded that a request for a lesser included instruction of felony murder was not shown by the evidence." S.H., p. 877. Trial counsel's state habeas affidavit described the defense's guilt/innocence strategy:

> That under the first phase of trial, Mr. Thompson was only guilty as a party to the offense of aggravated robbery, not either murder or capital murder. The basis of our cross-examination, and defensive strategy was that Mr. Thompson knew of and intended to participate in an aggravated robbery, but in no way did he either know or anticipate that someone would be killed, especially under the circumstances of the complaining witness' death.

S.H., p. 876. With that understanding, trial counsel's argument, which carried over into the punishment phase, was as follows:

> 1. The fact that Mr. Thompson was not the shooter. 2. That the manner in which the complainant was killed, i.e. as they drove away, Mr. Butler shot in the dark and the complainant was standing at the door. Mr. Thompson was in no way responsible for the death of Mr. Rahim, and could not have anticipated that butler would shoot as they were driving away and it was dark. 3. That Mr. Thompson's intent was to commit an

aggravated robbery and nothing more, which he did.

*Ex parte Thompson*, 179 S.W.3d at 558.

As the Court of Criminal Appeals stated, the evidence showing Thompson's "intent to kill is not merely sufficient, it is overwhelming." The Court of Appeals pointed to numerous factors showing Thompson's intent:

- [Thompson] came to the convenience store armed with a semiautomatic pistol;
- [Thompson] knew that Butler came to the convenience store armed with a .38 revolver;
- [Thompson] intentionally pointed his pistol at Mr. Meredia and demanded money;
- [Thompson] intentionally shot Mr. Meredia in the abdomen;
- [Thompson] intentionally shot Mr. Meredia three more times as he lay on the ground;
- [Thompson] intentionally shot at Mr. Rahim who was fleeing to the back of the store;
- [Thompson] intentionally put his semiautomatic pistol against Mr. Meredia's neck and pulled the trigger; the only reason Mr. Meredia did not die from that intentional act was because [Thompson's] revolver was out of bullets;
- [Thompson] intentionally hit Mr. Meredia over the head with the butt of his revolver; and
- [Thompson] intentionally struck Mr. Meredia with the cash register drawer.

*Thompson*, 179 S.W.3d at 555.

The Court of Criminal Appeals stated that "[f]rom this evidence of [Thompson's] obvious intent to kill Mr. Meredia and his repeated attempts to do so, any reasonable juror could conclude that [Thompson] also intended that his accomplice, Sammy Butler, kill Mr. Rahim":

- Butler came to the convenience store armed with a .38 revolver;
- Butler knew that [Thompson] came to the convenience store armed with a semiautomatic pistol;
- Butler knew that [Thompson] shot Mr. Meredia several times;
- Butler shot at Mr. Rahim and another customer while [Thompson] was shooting at Mr. Meredia;
- Butler threatened to shoot other customers while [Thompson] was grabbing the money from the cash register;
- Butler did shoot in the direction of Mr, Rahim a second time while both robbers were still in the store;
- After [Thompson] and Butler got into their getaway car, Butler rolled down the passenger-side window and shot Mr. Rahim who had run to the door of the store;
- Butler shot at Mr. Rahim twice;
- One of those shots hit Mr. Rahim in the chest and killed him; and
- [Thompson] told police during his oral confession that Butler "kept shooting. He unloaded and I unloaded."

*Ex parte Thompson*, 179 S.W.3d at 555–56.

Importantly, the Court of Criminal Appeals noted that by avoiding discussion of Thompson's intent, defense counsel prevented the State from introducing testimony about Thompson's other capital murders during the liability phase:

there might well have been a very serious downside had applicant offered any evidence of lack of intent or had he engaged in any cross-examination that might raise an issue concerning his lack of intent to kill. Once applicant opens the door to the issue of murderous in-

tent, the State would presumably walk right through that door with the evidence of the two extraneous capital murders that applicant himself committed to prove that he had a murderous intent on this occasion just as he had on those two other occasions

When judging an attorney's conduct in retrospect, we cannot assume that only his conduct might have been different. We must assume that, as in a chess game, if a defendant hypothesizes a different strategy or move by his pawn or queen, the State would have altered its strategy and made a different move with its chess pieces as well. In this case, applicant's case at the guilt phase might have been considerably worsened had he attempted to raise an issue concerning his intent to kill.

*Ex parte Thompson,* 179 S.W.3d at 560 (footnote omitted).

Trial counsel tried to secure a conviction for a lesser offense—aggravated robbery—by arguing that Thompson could not anticipate Butler's actions. Given the evidence, the Court of Criminal Appeals stated that this "argument was at least as strong—if not stronger—than the argument that Butler did not intend to kill Mr. Rahim and that his act of shooting at him twice was an unforeseeable accident, albeit an act clearly dangerous to human life." *Thompson,* 179 S.W.3d at 558–59.

The defense strategy carried over into the punishment phase. The second special issue focused on whether Thompson "intended to kill Mansoor Bhai Rahim Mohammed or another or that he anticipated that a human life would be taken." The guilt/innocence argument gave the defense a basis on which to seek a sentence less than death. Trial counsel reviewed the facts and made a strategic decision not to seek a felony murder instruction. The Court of Criminal Appeals affirming of that decision is amply supported. There is no basis for relief on this claim. *See* 28 U.S.C. § 2254(d)(1).

### 4. Counsel's Failure to Object to Testimony about the Victim's Good Character (Claim 7)

 Thompson faults his trial counsel for not objecting to what he calls "good character evidence" about the victim. During the guilt/innocence phase, witnesses briefly stated that the two store clerks "were good people"; that during the robbery, Rahim shielded a bystander from bullets; and that the clerks were nice to customers. Thompson argues that this testimony allowed the jury to contrast his unlawfulness with the victim's good character traits, making the jury more likely to convict him and find him worthy of death. Thompson faults trial counsel for not objecting to the testimony about the victim's good qualities.

When Thompson raised this issue on direct appeal, the Court of Criminal Appeals found that trial counsel's representation did not fall below constitutional requirements. The Court of Criminal Appeals noted that to succeed on this claim, Thompson would have to prove that the testimony was not admissible and that it would have affected the outcome of trial. The Court of Criminal Appeals overruled Thompson's claim. *See Thompson,* 2003 WL 21466925, at *6.

Thompson does not point to any federal or state authority that trial counsel could have used to challenge the witnesses' testimony. Thompson argues that "under *Payne v. Tennessee* [501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)] . . . there is a fundamental reason why a victim's general character should not be an issue in a trial, especially in guilt innocence." (Docket Entry No. 7 at 21). In *Payne,* the Supreme Court found no *per se*

bar to victim-impact evidence in the guilt/innocence or sentencing phases of trial. In fact, the Supreme Court recognized that "[i]n the majority of cases ... victim impact evidence serves entirely legitimate purposes," only violating the Constitution in extreme circumstances. *Payne,* 111 S.Ct. at 2608. *Payne* recognized that testimony about a victim's good character often has "relevance at the guilt phase of trial." *Payne,* 111 S. Ct at 2607; *see also Beazley v. Johnson,* 242 F.3d 248, 257 (5th Cir.2001) ("The admission of victim impact testimony *at the punishment phase* does not violate the Constitution *unless* the remarks so infect the sentencing proceedings as to render the result fundamentally unfair."); *Bennett v. Angelone,* 92 F.3d 1336, 1348 (4th Cir.1996) ("*Payne* suggests that limited background evidence may be admitted-indeed, may have to be admitted-at the guilt phase of trial."). Thompson does not direct the court to any Texas statute or rule on which his counsel could have relied in objecting to the challenged testimony. Thompson has not shown how trial counsel could have excluded this testimony at the guilt phase.

Nor has Thompson shown a reasonable likelihood that, had counsel objected to the victim-impact testimony, there would have been a different result. Not all the challenged comments directly described the victim's character. For example, the testimony that the victim shielded a bystander from gunfire was part of a narrative of the events surrounding the murder and only inferentially showed the victim's good character. The testimony about the victim's character was brief. The prosecution did not emphasize the victim's character during closing argument. The challenged testimony was not of a nature or extent that threatened the trial's fundamental fairness. The Court of Criminal Appeals's

decision that Thompson did not meet the *Strickland* standard was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 5. Counsel's Failure to Object to Dismissal, of a Prospective Juror (Claim 8)

■ Thompson contends that trial counsel provided ineffective assistance by acquiescing to the dismissal of potential juror Yvonne Josie West. During the voir dire examination, the State's questioning revealed that West was enrolled in college. West explained that although serving as a juror would force her to drop her college classes, she was willing to serve and could be impartial.

After the State questioned West, the following colloquy occurred:

The State: I'll agree to let this lady go so she can go to school if they want to agree.

Trial counsel: I guess we have to agree.

The State: I'm sorry.

Trial counsel: That's fine[.] We agree.

Trial court: Do you agree with that, Mr. Thompson?

Thompson: Yes, sir.

Trial court: Ma'am, you're free to go.

S.F. Vol. 16 at 80. Thompson argues that the prosecution forced defense counsel to allow West's dismissal from the panel. Thompson contends that West would have been a favorable juror for the defense.

Thompson raised this claim on direct appeal. The Court of Criminal Appeals stated as follows:

This exchange alone does not substantiate [Thompson's] claim that the State coerced counsel into rendering ineffective assistance. Not only did counsel agree to excuse the juror as allowed by Article 35.05,[15] [Thompson] agreed to ex-

---

**15.** Article 35.05 states: "One summoned upon a special venire may by consent of both parties be excused from attendance by the court at any time before he is impaneled."

cuse the juror as well, affirmatively consenting to counsel's actions. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Because counsel's actions comported with the statute and [Thompson's] consent, [Thompson] fails to show that the State forced counsel to render deficient performance, much less prejudicial performance.

*Thompson,* 2003 WL 21466925, at *3 (footnote in original). Thompson makes no effort to challenge the basis of this statement. Trial counsel agreed to dismiss a potential juror who qualified for an exemption from jury service.[16] Thompson himself approved excusing this potential juror. The record reveals no basis whatsoever for concluding that West would have favored the defense had she served on the jury. Thompson provides no basis for this court to find that "in the absence of defense counsel's errors, a *different* factfinder [like Ms. West] ... would have been reasonably likely to arrive at a *different* outcome." *Nichols,* 69 F.3d at 1287 (quotation omitted). Thompson has not shown that the state court's rejection of this claim was contrary to. or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 6. Trial Counsel's Absence from Jury Selection (Claim 9)

Thompson contends that his lawyers "abandoned" him during one point in jury selection, allowing the State to question potential jurors without defense counsel present. Thompson bases his claim on the following statement made by the prosecutor as he started questioning a potential juror: "Again, my name is Terrance Windham. I'm real pleased to meet you, sir. You met Mr. Greenlee and Connie [Williams] and [co-counsel for the State] Casey [O'Brien] yesterday. They're out

right now, but they'll be back in." S.F. Vol. 14, p. 153. Thompson argues that the phrase "[t]hey're out right now" indicates that neither of his attorneys was in the courtroom, leaving him without counsel.

The Court of Criminal Appeals found the prosecutor's statement unclear and insufficient to show that Thompson's attorneys provided ineffective assistance:

> Counsel's statement is ambiguous as to which of the three people the prosecutor was referring, and it seems more likely that it referred to the co-counsels on both sides. Further, the record does not support the contention that both defense counsel missed Juror Honc's voir dire. Defense counsel Greenlee began his voir dire of Juror Honc immediately upon the conclusion of the prosecutor's examination. Without any additional evidence that counsel indeed missed the voir dire of Juror Honc, [Thompson] has failed to provide this Court enough information even to initiate a *Strickland* analysis.

*Thompson,* 2003 WL 21466925, at *4. In his federal petition, Thompson has made no effort to substantiate his claim that trial counsel "abandoned" him during jury selection. Absent evidence that defense counsel was absent during voir dire, Thompson fails to show that the Court of Criminal Appeals' rejection of this claim made a decision contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 7. Preparation and Presentation of Mitigating Evidence (Claim 14)

Thompson faults trial counsel's preparation and presentation of testimony in the punishment phase. Thompson attached two affidavits to his federal petition, one by his mother and the other by his grand-

---

**16.** Under Texas law, Ms. West was exempt from jury service as a college student. *See* TEX. GOV'T CODE 62.106(a)(4). Ms. West did not voluntarily elect to exert that exemption.

mother. The affidavits give details about Thompson's childhood that were not presented at trial. Thompson has recently secured additional affidavits from friends and family members, again with information not presented at trial. (Docket Entry No. 28). These affidavits paint a bleak picture of Thompson's childhood. His mother had substance abuse problems that caused her to overdose twice while pregnant with him. He was physically abused as a baby. His mother had been incarcerated. His family members had a history of mental illness and substance abuse. He was shuffled among several family members while growing up. He quit school in the tenth grade. All affiants stated that the defense team did not contact them before trial. Thompson contends that this information would have affected the jury's answers to the special issues.

 Thompson never presented this claim in state court. The respondent argues that Thompson's failure to exhaust this claim bars federal consideration of the newly acquired mitigating evidence. Recognizing that he did not give the state courts an opportunity to consider his claims in the first instance, Thompson has filed two motions asking this court to stay the federal action so that he can exhaust his state remedies as to this claim. (Docket Entry Nos. 20, 28). Thompson has not shown that a stay is necessary or appropriate.

In *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), the Supreme Court adopted a stay-and-abeyance safety valve for considering unexhausted claims. This safety valve allows for the development of meritorious claims while preserving the AEDPA's goal of finality and efficiency. *See id.* at 1535; *see also Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 2130, 150 L.Ed.2d 251 (2001) (Stevens, J. concurring) (encouraging adoption of a stay-and-abeyance procedure). *Rhines* does not, however, require federal courts to stay every petition advancing one or more unexhausted claims. *Rhines* authorizes stay-and-abeyance only when the petitioner shows: (1) good cause for failing to exhaust the claim; (2) that the claim is not plainly merit less; and (3) that he has not intentionally engaged in dilatory tactics. *See Rhines*, 125 S.Ct. at 1535. Thompson has made none of these showings.

Thompson received one full round of direct and collateral state review, during which he made no effort to advance the claim he raises for the first time in federal court. He does not show why he failed to raise the claim in state court. Thompson further delayed raising the claim. Thompson filed an unexhausted federal petition, rather than a successive application in state court. *See Villegas v. Johnson*, 184 F.3d 467, 473 (5th Cir.1999) (finding that successive state habeas applications, even those which the Texas courts refuse to consider on the merit s, toll the AEDPA's limitations period). *Rhines* prohibits the abeyance of federal proceedings when "a petitioner engages in abusive litigation tactics or intentional delay[.]" *Rhines*, 125 S.Ct. at 1535.

Even after Thompson filed his federal habeas petition, he delayed asserting this claim. A petitioner with an unexhausted claim should request a stay early in the course of federal litigation, preferably by filing a " 'protective' petition in federal court" and then expeditiously moving for a stay. *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807, 1813, 161 L.Ed.2d 669 (2005). Thompson filed his federal habeas petition on October 20, 2006. (Docket Entry No. 7). Thompson waited several months to file his motion to stay and abate. By then, the parties had already briefed the legal and factual issues in this case.

Pausing the federal action at this late date for the extended period needed for exhaustion "frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and "also undermines AEDPA's goal of streamlining federal habeas proceedings[.]" *Rhines,* 125 S.Ct. at 1534. Abatement is an equitable mechanism to ameliorate the AEDPA's harsh provisions. It is only available when the petitioner shows diligence in asking for such relief. Thompson's delay in pursuing his unexhausted claim and requesting a return to state court weighs heavily against granting such relief.

The exhaustion doctrine, including the stay-and-abeyance safety valve, is predicated on the availability of state-court remedies. *See* 28 U.S.C. § 2254(b)(1). Texas strictly enforces its abuse-of-the-writ doctrine, codified at Tex.Code Crim. Pro. art. 11.071 § 5(a), and generally prohibits the filing of successive habeas applications. Thompson does not establish that he meets the State's demanding requirements for filing a successive state habeas application. In fact, Thompson concedes that "any subsequent state habeas writ would likely be dismissed under the state's . . . 'abuse of the writ' doctrine." (Docket Entry No. 20 at 1). Because Texas would apply its procedural law to prohibit the filing of a successive state application, staying Thompson's federal petition at this point would cause needless delay.

In the penalty phase, defense counsel called three witnesses who had known Thompson. They testified that Thompson lived with relatives while his parents were incarcerated and became a good, church-going person. The trial record shows that trial counsel had some familiarity with Thompson's background, S.F. Vol. 24, pp. 114–17. Trial counsel's affidavit also states that "there simply was not much in the way of mitigation to provide." Trial counsel limited the mitigation testimony because "Mr. Thompson did not want [his attorneys] to present any evidence in the way of mitigation." S.H., p. 877. A defendant's voluntary decision not to present mitigating evidence can prevent a later claim of ineffective assistance. *See Schriro v. Landrigan,* 550 U.S. 465, 127 S.Ct. 1933, 1942–44, 167 L.Ed.2d 836 (2007). Thompson has neither shown that his trial counsel's recollection is faulty. Nor has Thompson contradicted his counsel's statement that Thompson himself limited the punishment-phase mitigation evidence. Thompson has not shown that his attorneys erred by following his wishes.

Additionally, Thompson has not shown a reasonable probability of a different result had counsel adopted his proposed punishment phase strategy. The new information Thompson presents for the first time on federal review, while providing a background into his life, withers in comparison to his criminal history. His violent acts would weigh heavily against the mitigating evidence. The evidence focuses on prenatal and youthful difficulties, with no evidence showing that they caused Thompson's later criminal behavior.

Thompson has not made a showing that his unexhausted claims would entitle him to habeas relief from the state courts. The new affidavits from Thompson's friends and family members show a sad and troubled childhood, but do not support the conclusion that the additional mitigating evidence would have altered the outcome. Thompson has not made a convincing showing that he could succeed on the merit's of the unexhausted claim.

Thompson's motions to stay are denied. Thompson's mitigation evidence claim is unexhausted and procedurally barred. Thompson makes no effort to overcome the resultant procedural bar and has not shown that he is entitled to habeas relief.

### 8. Trial Strategy (Claim 15)

Finally, Thompson alleges that trial counsel should have used a different defensive strategy at trial. Thompson alleges that trial counsel made two strategic errors: (1) not securing the assistance of an expert witness early enough to prepare for jury selection and then not presenting psychological testimony at trial; and (2) not presenting Butler's confession at trial.[17] A petitioner questioning trial counsel's strategy faces a difficult challenge because federal courts presumptively defer to an attorney's reasoned, strategic decisions. *See Titsworth v. Dretke*, 401 F.3d 301, 310 (5th Cir.2005) ("We are to accord substantial deference to counsel's performance, applying the strong presumption that counsel performed adequately and exercised reasonable professional judgment.").

 Thompson's claim that counsel was deficient in failing to present psychological testimony at trial fails. Before trial, the court appointed a doctor, Ann Wheeler, to perform an independent psychiatric evaluation. Trans., p. 94. Trial counsel apparently did not communicate with Dr. Wheeler until trial had already started. During the guilt/innocence phase, the trial court and Thompson's attorneys discussed Dr. Wheeler's examination out of the jury's presence. Trial counsel told the court that information from the examination "would be to [their] disadvantage and not be useful to the Defense." S.F. Vol. 24, p. 114. Trial counsel informed the court that they had spoken with Dr. Wheeler and, as a result of that discussion,

asked her not to prepare a written report because it "would be very, very damaging to the Defendant." S.F. Vol. 24, p. 115. Trial counsel stated that Thompson told Dr. Wheeler that he committed several robberies and "he would do the same thing again." S.F. Vol. 24, p. 116. From her examination of Thompson, Dr. Wheeler opined that "he's a sociopath, only cares about one person, has no respect for anyone else's life." S.F. Vol. 24, p. 117. Trial counsel's affidavit affirmed that, having reviewed Dr. Wheeler's opinions, "it would not be in Mr. Thompson's best interest to use the doctor[.]" S.H., p. 877. The record defeats any inference that, even if trial counsel had Dr. Wheeler's opinion before trial, it would have changed the defensive strategy.

 Thompson also faults trial counsel for not "forc[ing] the state or Mr. Butler and his defense team to provide [Butler's] exculpatory statement." (Docket Entry No. 7 at 33).[18] But trial counsel's affidavit shows that before trial, counsel reviewed Butler's statement to the police and interviewed him. Trial counsel decided not to introduce Butler's statement into evidence because: (1) it reinforced the fact that the men planned the robberies and purchased guns for that purpose; and (2) whatever Butler claimed his intent may have been, Thompson shot the men in the store, demonstrating his own intent to kill. Having reviewed the testimony Butler could have provided, trial counsel reasonably chose not to call Butler as a witness or to present his confession at trial. Even if trial

---

17. Thompson also argues that trial counsel should have crafted a defense strategy based on a felony murder instruction. This court has already found that trial counsel did not provide ineffective assistance in that respect.

18. The record does not contain a confession by Butler or the trial testimony from his case that enabled him to avoid a capital conviction. On state habeas review, however,

Thompson submitted an affidavit Butler prepared after his trial wherein he said that his statement to the police, in essence, was: "it was never my intent to cause the death of [the victim] when I shot from the car as we tried to escape." S.H., p. 1094. Butler's affidavit affirms that, if called as a witness in Thompson's trial, he would have invoked his Fifth Amendment rights. S.H., p. 1094.

counsel had presented Butler's confession, the issue was Thompson's, not Butler's, intent. Thompson repeatedly shot and beat one man in the store. He also shot at the victim. The evidence strongly supported the conclusion that Thompson intended to kill, regardless of Butler's intent. Thompson has not shown that the state court's conclusion that trial counsel did not provide ineffective assistance was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### C. Claims Relating to Butler's Conviction and Sentence (Claims 10, 11, and 13)

Thompson complains because he was convicted of capital murder and received a death sentence, while Butler was not.[19] The State of Texas charged Butler with capital murder. Thompson was convicted and sentenced to death before Butler's trial. The jury convicted Butler of felony murder. Thompson asserts that he should have received the same punishment as Butler. Presuming that his conviction rested on the Texas law of the parties, Thompson argues that Butler's conviction and lower punishment undermines the constitutional integrity of his own in three ways: (1) the Eighth Amendment prohibits a party to a crime from being more criminally responsible than the primary actor (Claim 10); (2) due process prevents a party's death sentence when the primary actor is convicted of a noncapital crime (Claim 13); and (3) Butler's conviction makes Thompson factually innocent of capital murder (Claim 11).

Thompson identified no basis in Texas law or in federal constitutional law to limit his criminal liability to that of his co-perpetrator. Assuming that his conviction rested on the Texas law of the parties, Thompson argues that this law "looks to the intent of the principal as a guide" so that his intent "must be imputed to the co-actor, the party[.]" (Docket Entry No. 26 at 3). Thompson's claims ignore the fact that his conviction was based on his own criminal culpability, not Butler's. Party liability does not allow the State to obtain one defendant's conviction on the basis of the primary actor's intent. Texas law has long held that "every defendant on trial for homicide is to be judged according to his own intent[.]" *Leslie v. State*, 42 Tex. Crim. 65, 57 S.W. 659, 660 (1900). Party liability requires the prosecution to prove, beyond a reasonable doubt, that the defendant himself had "the kind of culpability required for the offense," "inten[ded] to promote or assist the commission of the offense," or "committed [the offense] in furtherance of [an] unlawful purpose ... and [the party] should have ... anticipated [the result]," regardless of the primary actor's intent. Tex. Penal Code § 7.02(a) & (b); Trans., p. 136. Texas law does not allow a party's conviction and sentence to be based on, or limited to, that of the primary actor.

Nothing in Texas law limits one defendant's conviction and sentence to the criminal liability of another who participated in the same crime, even as the principal. Texas allows a conviction under the law of the parties even when the principal

---

**19.** When Thompson raised his eleventh claim, that he is factually innocent of capital murder, the lower state habeas court procedurally barred the claim because it was, in essence, a sufficiency of the evidence claim not reviewable on habeas. State Habeas Record at 1112; *see also Ex parte Santana*, 227 S.W.3d 700, 705 (Tex.Crim.App.2007) ("A challenge to the sufficiency of the evidence, however, is not cognizable in an application for a writ of habeas corpus."); *Coleman v. Quarterman*, 456 F.3d 537, 546 (5th Cir.2006) ("Texas has long held that sufficiency of the evidence claims are not cognizable in state habeas proceedings."). Thompson makes no effort to overcome the procedural bar.

actor is immune from prosecution. *See Boyer v. State,* 801 S.W.2d 897, 899 (Tex. Crim.App.1991). Texas law expressly prohibits reforming a party's conviction or sentence because the principal actor was acquitted or convicted of "a different offense or of a different type or class of offense[.]" TEX. PENAL CODE § 7.03.[20] To hold otherwise would capriciously condition a party's conviction and sentence on the jury's decision in another criminal case. Thompson has not shown that his conviction or sentence was not sound under the Texas law of the parties.

■ Nor has Thompson shown that federal law prohibits convicting a party of a more serious offense than the primary actor. No Supreme Court precedent requires such parity. *See Farnsworth v. Zerbst,* 98 F.2d 541, 544 (5th Cir.1938) ("One may die, may escape, or obtain a pardon; but the other remains guilty."). Texas charged both Thompson and Butler with the same crime. Thompson's complaint arises out of the juries' verdict. Thompson's argument ignores "the simple, if discomforting, reality that 'different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system.' While symmetry of results may be intellectually satisfying, it is not required." *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 2009, 64 L.Ed.2d 689 (1980) (quoting *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1313, n. 30, 1 L.Ed.2d 1498 (1957)); *see also Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974) ("The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged."). The Fifth Circuit has noted that "the apparent logical inconsistency of jury verdicts, even among multiple defendants tried together on essentially the same evidence and charges, provides no basis for attacking an otherwise valid guilty verdict adequately supported by the evidence; rather, each such verdict or conviction is to be reviewed wholly independently of the others." *United States v. Espinosa–Cerpa,* 630 F.2d 328, 332 (5th Cir.1980); *cf. Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 2008–09, 64 L.Ed.2d 689 (1980) (finding that a defendant accused of aiding and abetting in the commission of a federal offense may be convicted after the named principal has been acquitted of that offense in a previous trial). Nothing in federal law precludes applying the death penalty to those who participate in a crime with a principal who does not receive a death sentence. Supreme Court jurisprudence, particularly that flowing from *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), holds that "the death penalty [cannot] be imposed in a felony murder case if the defendant was a minor participant in the crime and neither intended to kill nor had shown reckless indifference to human life." *Hopkins v. Reeves,* 524 U.S. 88, 118 S.Ct. 1895, 1899, 141 L.Ed.2d 76 (1998). The Constitution requires that a defendant's sentence "be tailored to his personal responsibility and moral guilt."

---

**20.** TEX. PENAL CODE § 7.03 states that

In a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that he was a party to its commission, and it is no defense:

(1) that the actor belongs to a class of persons that by definition of the offense is legally incapable of committing the offense in an individual capacity; or

(2) that the person for whose conduct the actor is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution.

*Enmund,* 102 S.Ct. at 3378. Here, the jury instructions in both trial phases complied with *Enmund*'s and *Tison*'s focus on each individual defendant's actions and intent.

While "justice must satisfy the appearance of justice," *Offutt v. United States,* 348 U.S. 11, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), the Constitution does not require that Thompson's conviction and sentence be less severe than Butler's. To hold otherwise would require the creation of new constitutional law, in violation of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Thompson's claims relating to Butler's conviction for a lesser offense are denied.

### D. The *Brady* Claim (Claim 12)

Thompson claims that the prosecution suppressed material evidence from his attorneys. Specifically, Thompson alleges that the prosecution did not turn over to the defense a copy of Butler's confession. In Butler's police statement, he apparently stated that he did not intend to kill the victim when he shot at him. S.H., pp. 900, 1094. Thompson claims that, had trial counsel possessed that information, he "would likewise have escaped the hangman, as did Mr. Butler." (Docket Entry No. 26 at 12).[21]

On state habeas review, Thompson requested an evidentiary hearing because "it is unclear whether the State provided copies of Butler's statements to trial counsel." S.H., p. 53. During the state habeas proceedings, trial counsel submitted an affidavit stating that he had reviewed Butler's confession. S.H., p. 914. When Thompson filed his proposed findings of fact and conclusions of law, he conceded that his *Brady* claim was "without merit in that

trial counsel had access to Butler's custodial statement." S.H., p. 1082. The trial court found that State had disclosed Butler's custodial statement and that trial counsel had interviewed Butler before trial. S.F., p. 1111.

On federal habeas review, Thompson renews his *Brady* claim. Thompson makes no effort to present clear and convincing evidence to rebut the presumptively correct state factfindings. He provides no justification for raising this claim after expressly abandoning it on state habeas review. He provides no basis to disregard or reject trial counsel's affidavit. Thompson fails to explain the legal or factual basis for resurrecting this claim here. Thompson's *Brady* claim has no merit.

### V. Certification of Issues for Appeal

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R.APP. PRO. Rule 22(b). Thompson has not yet requested that this court grant him a Certificate of Appealability ("COA"), though this court can consider the issue *sua sponte. See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000). Clear, binding precedent forecloses relief on Thompson's claims. Thompson has not shown that this court should certify any issue for appellate consideration. This court will not certify any issue for review by the Fifth Circuit. Thompson may ask the Fifth Circuit to

---

**21.** Tension exists between Thompson's *Brady* claim and his allegation that trial counsel rendered ineffective assistance by not using Butler's account of the crime. If the State suppressed Butler's account, trial counsel cannot be faulted for not relying on it in forming a defense.

issue the certificate of appealability. *See* FED. R.APP. PRO. Rule 22(b) ("If the district judge has denied the certificate, the appellant may request a circuit judge to issue the certificate").

## VI. Conclusion

The court grants the respondent's motion for summary judgment. The court denies Thompson's outstanding motions, including his request for factual development (Docket Entry Nos. 19, 21, and 22) and two motions for abatement (Docket Entry Nos. 20, 28). The court will not certify any issue for appellate review. A final judgment is entered by separate order.